04-MJ-05205-CMP

FILED ____ LODGED
____ RECEIVED
OCT 27 2004
CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT TACOMA
BY                                DEPUTY

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> ALEJANDRO URBANO ESPERENZA, ) <br> FERNANDO ACOSTA VAZQUEZ, ) <br> YOLANDA GONZALEZ, and ) <br> KIMBERLY DAWN AVINA, ) <br> ) <br> Defendants. ) | MAGISTRATE'S DOCKET <br> NO. CR04-5205M <br> COMPLAINT for VIOLATION of <br> Title 21, U.S.C. Sections 841(a)(1) <br> and 846 |

Before Karen L. Strombom, United States Magistrate Judge, 1717 Pacific Avenue, Tacoma, Washington

The undersigned complainant being duly sworn states:

COUNT 1
(Conspiracy to Distribute Heroin)

Beginning sometime within the last five years, at Pierce County, within the Western District of Washington, ALEJANDRO URBANO ESPERANZA, FERNANDO ACOSTA VAZQUEZ, YOLANDA GONZALEZ, AND KIMBERLY DAWN AVINA knowingly and intentionally did conspire among themselves and with others, to distribute heroin, a Schedule I controlled substance.

It is further alleged that the above offense involved one thousand (1000) grams and more of a mixture or substance containing heroin.

All in violation of Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(A), and 846.

Complaint - 1

The undersigned complainant being duly sworn states:

1. I am a Special Agent with the Drug Enforcement Administration (DEA), United States Department of Justice (DEA), and have been so employed since November 1999. In that capacity, I investigate violations of the Controlled Substances Act (Title 21, United States Code, Section 801, et seq.). I am currently assigned to the Seattle Field Division, Tacoma Resident Office. I have completed DEA Basic Agent Training, the Complex Conspiracy and Investigations Course and the Undercover Supervisor's Training Course which have familiarized me with investigations of drug trafficking organizations, methods of importation and distribution of controlled substances, and financial investigations. In addition, I have participated in over eighty criminal investigations involving organizations trafficking in controlled substances and, as a result, have an understanding of the manner in which narcotics are distributed and the various roles played by individuals and groups in their distribution. During my five years with the DEA, I have participated in the obtaining and/or execution of approximately one hundred narcotics search warrants. Prior to my employment by the DEA, I was a Captain in the United States Marine Corps. I served in the Marines from June 13, 1992 through August 1, 1999.

2. The following information is based on my own investigation of ALEJANDRO URBANO ESPERENZA, FERNANDO ACOSTA VAZQUEZ, YOLANDA GONZALEZ, and KIMBERLY DAWN AVINA for heroin distribution and on information obtained from other law enforcement agents and officers who participated in the investigation. Based upon information provided by a reliable DEA Confidential Source (hereinafter referred to as CS), I began a DEA investigation of ALEJANDRO URBANO ESPERENZA, FERNANDO ACOSTA VAZQUEZ, YOLANDA GONZALEZ and KIMBERLY DAWN AVINA.

3. In August, 2004 Task Force Officer (TFO) Robert L. Jones II and your Affiant interviewed a DEA Confidential Source, hereinafter referred to as CS, regarding drug traffickers known to him/her. During the interview, the CS stated that in late June 2004, he/she met a Hispanic male by the name of "ALEJANDRO", subsequently identified by law enforcement as ALEJANDRO URBANO ESPERENZA. The CS described "ALEJANDRO" (URBANO ESPERENZA) as a Hispanic male, approximately 30-35 years of age, standing approximately

5'7" tall, weighing approximately 170 pounds with short black hair. The CS stated that URBANO ESPERENZA is employed as a painter. The CS stated that he had been told by a mutual associate that URBANO ESPERENZA was a large heroin distributor in the Tacoma, Washington area. At the direction of TFO Robert Jones and your Affiant, the CS asked the mutual associate if he/she would give URBANO ESPERENZA the CS's phone number.

4.      The CS further stated in the interview, that in late June, 2004 URBANO ESPERENZA called and told the CS that he wanted to give the CS his phone number so the CS could call him when he/she was ready to purchase heroin. The phone number given to the CS was 253-536-3275. This phone number is registered to Esperenza Urvano-Calvo, at 2112 South 90th Street, #92, Tacoma, Washington. Law enforcement later learned that this was the residence of URBANO ESPERENZA through a family member. URBANO ESPERENZA told the CS that he would sell the CS heroin at a price of $420 an ounce. Additionally, URBANO ESPERENZA told the CS that he preferred to start out selling six to eight ounces at a time to the CS. URBANO ESPERENZA told the CS once the CS has made a couple of purchases, he would sell larger quantities to the CS.

5.      The CS has proven to be a trustworthy and reliable confidential source for DEA for over four years. The CS has assisted DEA in over thirty narcotics investigations and made over sixty controlled purchases of narcotics under the control of agents/officers.

6.      On August 19, 2004, at approximately 7:00 a.m., at the direction of TFO Jones, the CS called URBANO ESPERENZA in an attempt to initiate this case. During this conversation the two agreed to meet to discuss future business. Later that evening, the CS met with URBANO ESPERENZA in Tacoma, Washington, at which time URBANO ESPERENZA arrived at the location on foot. During the meeting the CS asked URBANO ESPERENZA if he would be able to sell the CS heroin in large quantities to which URBANO ESPERENZA explained that his source has large quantities of heroin and could supply him with whatever the CS wanted. The CS told URBANO ESPERENZA that he/she would call him when he/she was ready to conduct business.

7. On August 30 and September 1, 2004, at the direction of TFO Jones and your Affiant, the CS called URBANO ESPERENZA and through a series of phone conversations, negotiated the purchase of one-half pound of heroin for September 2, 2004, at a price of $420 on ounce. During one of these recorded phone conversations, URBANO ESPERENZA told the CS that he would meet him/her at 7:00 p.m., on September 2, 2004, at the 7-11 store located at 96th Street South and Steele Street South, Tacoma, Washington, to conduct the transaction.

8. On the evening of September 2, 2004, URBANO ESPERENZA called the CS to inquire when the CS would be arriving. URBANO ESPERENZA also asked the CS how much heroin the CS wanted to purchase to which the CS replied eight ounces. Shortly after the phone conversation with the CS, law enforcement surveillance agents observed URBANO ESPERENZA exit from his apartment, located at 2112 South 90th Street, #92, Tacoma, Washington, and walk to the listed 7-11 convenient store.

9. After walking to the store, URBANO ESPERENZA met with the CS in his/her vehicle, and at the direction of URBANO ESPERENZA, they drove a short distance away, where URBANO ESPERENZA exited the CS' vehicle and walked to the pay phone, while the CS remained inside his/her vehicle. Shortly thereafter, URBANO ESPERENZA returned to the CS and his/her vehicle and informed the CS that his source of supply was going to send his girlfriend to deliver the heroin. Immediately thereafter, the CS and URBANO ESPERENZA drove back to the area of the 7-11 Store.

10. After returning to the area of the 7-11, surveillance agents observed a black colored Infinity Q-45 bearing Washington license, 456-LYG, pull into the parking lot east of where the CS had parked. After the Infinity's arrival, URBANO ESPERENZA exited the CS' vehicle and made contact with the female driver of the Infinity, subsequently identified by law enforcement as YOLANDA GONZALEZ, and then returned to the CS' vehicle.

11. GONZALEZ then led the CS and URBANO ESPERENZA North on Hosmer Street, to the Waverly Arms Apartments parking lot, where URBANO ESPERENZA met shortly with GONZALEZ, returned to the CS' vehicle and sold the CS approximately 234.9 gross grams of

1 | suspected heroin for $3,360.00. GONZALEZ then drove URBANO ESPERENZA away from
2 | the area to the vicinity of his apartment.
3 | 12.   Following the purchase of the suspected heroin on September 2, 2004, TFO Jones took
4 | custody of the drugs, then field-tested the drugs, which resulted in a positive test for the presence
5 | of heroin.
6 | 13.   On the evening of September 9, 2004, after several phone negotiations occurring on
7 | September 6th and 8th, URBANO ESPERENZA met the CS again at the same 7-11 Store,
8 | located at 96th Street and Steele Boulevard., Tacoma, Washington, for the negotiated sale of one
9 | pound of heroin. That evening, URBANO ESPERENZA arrived at the CS' vehicle on foot, after
10 | leaving his apartment and immediately entered the passenger seat.
11 | 14.   A short time after URBANO ESPERENZA placed a phone call, GONZALEZ drove to
12 | the 7-11 in the black Infiniti Q-45, Washington Plate 456-LYG, arriving in the parking lot behind
13 | where the CS and URBANO ESPERENZA were parked. KIMBERLY DAWN AVINA was a
14 | passenger in the front seat of the Q-45. URBANO ESPERENZA and the CS then followed
15 | GONZALEZ and AVINA back to the Waverly Way Apartments, previously used on September
16 | 2, 2004, where both vehicles parked. While riding with the CS, URBANO ESPERENZA
17 | identified his source for the heroin was "Pedro," and his runner's name is "YOLANDA."
18 | URBANO ESPERENZA further described "Pedro" as having an acne scarred face.
19 | 15.   After parking in the apartment parking lot, URBANO ESPERENZA walked to
20 | GONZALEZ' car window, where she handed him a package in a purple bag, which URBANO
21 | ESPERENZA placed under his shirt. URBANO ESPERENZA then returned to the CS' vehicle,
22 | retrieved the package from under his shirt, and sold approximately 509.4 gross grams of
23 | suspected heroin to the CS for $6,720.00 in U.S. Currency. After receiving the money,
24 | URBANO ESPERENZA counted the money in front of the CS then entered GONZALEZ'
25 | Infinity and rode away with GONZALEZ and AVINA.
26 | 16.   After leaving the apartment complex, surveillance agents followed GONZALEZ as she
27 | dropped URBANO ESPERENZA off near his apartment, then traveled throughout East Tacoma,
28 | where she and AVINA made several meets with various white males.

Complaint - 5

1 | Later that night, after one meeting with a white male at a Safeway Food Store, located at 56th and Yakima, in Tacoma, Washington, TFO Rich Warner requested Tacoma Police Department Officer John Branham to follow GONZALEZ and conduct a traffic stop on GONZALEZ's vehicle, after observing a traffic infraction. Officer Branham later stopped GONZALEZ, who identified herself to the officer as YOLANDA GONZALEZ with a date of birth of January 1, 1972 and stated her residence was 1803 101st Street South, Tacoma, Washington.

17. Following the traffic stop, and prior to their arrival at their apartment, a DEA agent was conducting surveillance at the apartment of GONZALEZ and AVINA. When they arrived in the area of the apartment, they received a phone call from ACOSTA VASQUEZ, warning them that police may be watching them. AVINA approached the vehicle in which the DEA agent was sitting and asked him why he was in the neighborhood. AVINA has previously accompanied GONZALEZ on dozens of prior heroin deliveries and has previously handled the heroin during, or in preparation for, a delivery. AVINA is a heroin addict who is currently on a methadone maintenance program.

18. Following the purchase of the suspected heroin on September 9, 2004, TFO Jones took custody of the drugs, and field-tested the drugs, which resulted in a positive test for the presence of heroin.

19. On September 14, 2004, at approximately 9:00 a.m., TFA Jones observed the above listed black Infinity Q-45 parked in front of the residence at 1803 101st Street South, Tacoma, Washington. TFA Jones also observed a white Infinity Q-45, Washington License Plate 936-HLV, and registered to Mercedes Margaret GONZALEZ, at 1803 101st Street South, Tacoma, Washington. Later that same afternoon, through the use of the CS, law enforcement attempted to make a controlled purchase of one-half pound of heroin from URBANO ESPERENZA and GONZALEZ. The CS met with URBANO ESPERENZA, but GONZALEZ would not complete the transaction.

20. On September 15, 2004, at the direction of TFO Jones, the CS called GONZALEZ, as URBANO ESPERENZA had used the CS' phone on September 14th to call GONZALEZ, which enabled the CS to recover her phone number. During the phone conversation, the CS asked

1  GONZALEZ if he/she had to go through "ALEJANDRO" (URBANO ESPERENZA) in order to
2  purchase heroin, to which GONZALEZ replied that she preferred the CS continue to go through
3  URBANO ESPERENZA. GONZALEZ told the CS that she didn't know the CS good enough to
4  deal directly with him/her. GONZALEZ asked the CS how much money he/she was paying
5  URBANO ESPERENZA for the heroin, to which the CS responded that he/she was paying
6  $420.00 per ounce. GONZALEZ told the CS that she was going to talk with her associate to see
7  if he would deal directly with the CS. GONZALEZ also told the CS that she did not want to sell
8  to the CS on September 14, 2004, because the heroin was of such poor quality. GONZALEZ
9  told the CS that she has different heroin now and would call the CS back at a later time.
10  21.    On the afternoon of September 20, 2004, the CS again agreed to meet URBANO
11  ESPERENZA for the purchase of one-half pound of heroin. Early that afternoon, following a
12  series of recorded phone conversations, URBANO ESPERENZA departed his apartment and
13  walked southbound along Hosmer Street, before arriving at the car wash, located at the southwest
14  intersection of Steele Street, and 96th Street, Tacoma, Washington, where he met with the CS.
15  At that time, URBANO ESPERENZA sold the CS approximately 223.4 gross grams of
16  suspected heroin for $3,360.00 in U.S. Currency. Prior to this transaction, URBANO
17  ESPERENZA told the CS that he would already have the heroin for the CS to purchase, so that
18  they would not have to wait on his source.
19  22.    On October 25, 2004, after a series of phone conversations, URBANO ESPERENZA
20  agreed to meet the CS at the previously listed car wash for the sale of two pounds of heroin.
21  During one of the phone conversations between the CS and URBANO ESPERENZA, the CS
22  was told by URBANO ESPERENZA that the "guy" was going to deliver the drugs and that the
23  "girl" may be there also.
24  23.    In the late morning of October 26, 2004, after several more phone calls confirming the
25  transaction, the CS met with URBANO ESPERENZA, who had walked from his residence, at
26  the same car wash that was used on September 20, 2004. Upon meeting with the CS, URBANO
27  ESPERENZA sat briefly with the CS in his/her vehicle, before making a phone call from a pay
28  phone at the car wash. After the phone call URBANO ESPERENZA rejoined the CS in his/her

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1  vehicle.

2  24. After approximately twenty minutes, a Hispanic male, subsequently identified by law
3  enforcement as FERNANDO ACOSTA VAZQUEZ, arrived at the car wash driving a small
4  white sedan and parked behind the CS' vehicle. URBANO ESPERENZA immediately walked
5  from the CS' vehicle and entered ACOSTA VAZQUEZ' vehicle. The two then drove to the side
6  of the building, where they parked briefly. After a few moments, URBANO ESPERENZA
7  emerged from ACOSTA VAZQUEZ' car, carrying a package under his shirt, which he held up
8  with his left hand. URBANO ESPERENZA then walked back to the CS' vehicle, as ACOSTA
9  VAZQUEZ drove away northbound on Hosmer Street.

10 25. As URBANO ESPERENZA returned to the CS, he sat inside of the CS' vehicle and
11 showed the CS approximately two pounds of heroin, contained in a McDonald's Food bag,
12 which he had retrieved from under his shirt. Upon seeing the suspected heroin, the CS walked to
13 the rear of his/her vehicle, where he signaled law enforcement that URBANO ESPERENZA had
14 the drugs. Immediately thereafter, your Affiant arrested URBANO ESPERENZA without
15 incident. Your Affiant then recovered approximately two pounds of heroin, which was sitting on
16 the front passenger seat, where URBANO ESPERENZA had been sitting. TFO Curt Alfano later
17 field-tested the suspected heroin on October 26, 2004, with positive results for the presence of
18 heroin.

19 26. Shortly after the arrest of URBANO ESPERENZA, law enforcement stopped ACOSTA
20 VAZQUEZ as he drove northbound away from the car wash. Upon stopping his car, ACOSTA
21 VAZQUEZ was arrested without incident. ACOSTA VAZQUEZ initially told law enforcement
22 that his name was JOSE MORALES. However, law enforcement later learned through rental
23 documents, that his true identity was FERNANDO ACOSTA VAZQUEZ, which he later
24 acknowledged to be his true identity.

25 27. Later on the afternoon of October 26, 2004, after conducting a search of ACOSTA
26 VAZQUEZ' wallet for his identity, your Affiant observed an address written on the back of a
27 storage unit card, 708 ½ South Fife Street, Tacoma, Washington. Your Affiant then directed law
28 enforcement to go to the residence and ask for permission to search. Upon arriving at the

Complaint - 8

1 | residence, law enforcement observed the black Infinity Q-45, previously used by GONZALEZ to
2 | deliver heroin to the CS on two occasions in September 2004.

3 | 28. When questioned by your Affiant about the black Infinity, the residents at 708 ½ South
4 | Fife Street, Tacoma, Washington, informed your Affiant that the car belonged to "Pedro," or also
5 | known to them as JOSE MORALES.

6 | 29. In the early evening of October 26, 2004, your Affiant directed law enforcement to go to
7 | the residence of YOLANDA GONZALEZ, located at 1803 South 101st, Tacoma, Washington,
8 | locate her and place her under arrest. Later that evening, law enforcement observed
9 | GONZALEZ arrive at her residence, and then took her into custody.

10 | 30. Following her arrest, TFO John Eads advised GONZALEZ of her Miranda Rights, which
11 | she then waived and agreed to cooperate with law enforcement. Later that evening, your Affiant
12 | interviewed GONZALEZ at her residence. During the interview GONZALEZ stated that she
13 | sold heroin for "Pedro" and positively identified ACOSTA VAZQUEZ. She further stated that
14 | she used to date him and had met him in a bar where she was working. She stated that she had
15 | been selling heroin for a little less than one year, and that she has only worked for "Pedro"
16 | (ACOSTA VAZQUEZ) during that period. GONZALEZ went on to state that she sells to five or
17 | six customers, but only small amounts. She calls "Pedro" (ACOSTA VAZQUEZ) whenever she
18 | needs more heroin. When questioned about black Infinity Q-45, GONZALEZ stated that
19 | "Pedro" had given her the car to use for work.

20 | 31. GONZALEZ further stated to your Affiant that she met "ALEJANDRO" (URBANO
21 | ESPERENZA) in a bar and was approached by him for the purpose of selling him heroin.
22 | GONZALEZ believed that URBANO ESPERENZA knew that she worked for "Pedro"
23 | (ACOSTA VAZQUEZ) and could provide him with large quantities of heroin.

24 | 32. Later on the evening of October 26, 2004, after ACOSTA VAZQUEZ waived his
25 | Miranda Rights and agreed to cooperate with law enforcement, ACOSTA VAZQUEZ stated that
26 | GONZALEZ works for him in the sale of heroin. ACOSTA VAZQUEZ pays GONZALEZ
27 | $1,000 per week to distribute heroin for him to his estimated ten customers. When asked about
28 | his source for the heroin, ACOSTA VAZQUEZ stated that he purchased the heroin from

1  "Michoacano," who previously supplied him with heroin on each delivery to "ALEJANDRO"
2  (URBANO ESPERENZA) by himself or GONZALEZ.
3  33.    Still later on October 26, 2004, at the request of TFO Jones and your Affiant, ACOSTA
4  VAZQUEZ called "Michoacano" at (253) 720-0929 and arranged to meet him the following
5  morning between eight and ten o'clock for the purchase of forty ounces of heroin at the
6  McDonald's Restaurant, located at the intersection of 38th Street and Pine Street, in Tacoma,
7  Washington.
8  34.    Following the arrest of the defendants, when questioned by Bureau of Immigration and
9  Customs Enforcement S/A Paul Cervantes about their immigration status within the United
10 States, URBANO ESPERENZA, and ACOSTA VAZQUEZ acknowledged that they were inside
11 the United States illegally.

*[signature]*
ERRIN P. JEWELL, Complainant
Special Agent
Drug Enforcement Administration

Complaint and affidavit SUBSCRIBED and SWORN to before me this 27th day of October, 2004. I further find there is probable cause to support this complaint, and authorize that the above-named defendants be detained.

*[signature]*
KAREN L. STROMBOM
United States Magistrate Judge